UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION



\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| DAVID A. WAFF, individually, and on behalf of all those similarly situated, | \* \* \* \* | CIV. 07-4166 |
| Plaintiff, | \* \* | |
| vs. | \* \* | |
| TIM REISCH; DOUGLAS L. WEBER; MISTI WAAGMEESTER; SHANNON MUCHOW[1]; JACKIE SCHWADER; DOUGLAS LOEN; JENNIFER LANE-WAGNER; and/or any other South Dakota Department of Corrections and/or State of South Dakota, Jane and/or John Doe employees, officials and/or agents, personally or in their individual capacities; | \* \* \* \* \* \* \* \* \* \* \* \* | REPORT and RECOMMENDATION (Motion for Summary Judgment, Doc. 71) |
| Defendants. | \* \* | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Pending is the Defendants' Motion for Summary Judgment (Doc. 71). In support of their Motion, the Defendants have filed a Statement of Undisputed Facts (Doc. 72), the Affidavit of Jennifer Wagner (Doc. 73), the Affidavit of Pam Linnweber (Doc. 74), the Affidavit of Lisa Baloun (Doc. 76), a Memorandum in Support of Summary Judgment (Doc. 75), and a Reply Brief in Support of Summary Judgment (Doc. 77). Plaintiff failed to respond to the Motion.

---

[1] Ms. Muchow was named in the Complaint but was never served with suit papers. On May 21, 2009, the Court ordered that if service was not effected upon Ms. Muchow by June 12, 2009, she would be dismissed from the lawsuit. *See* Doc. 64.

## INTRODUCTION

Plaintiff is an inmate at the South Dakota State Penitentiary (SDSP) in Sioux Falls, South Dakota. He filed this *pro se* civil rights lawsuit pursuant to 42 U.S.C. § 1983, and 42 U.S.C. § § 2000cc et. al. (the Religious Land Use and Institutionalized Persons Act of 2000--RLUIPA). Plaintiff alleges the religious diet policy at the SDSP is unconstitutional and violates his due process rights. He asserts Defendants deprived him of his ability to reasonably practice his sincerely held religious beliefs "e.g. denial of an adequate and nutritionally balanced kosher diet." Plaintiff sued the Defendants in their official and individual capacities. He requests injunctive relief in the form of an order directing the Defendants to "immediately provide a nutritionally balanced and adequate diet that is in keeping with Plaintiff's religious requirements," and to direct Defendants to "initiate steps or actions to reasonably permit Plaintiff to reasonably practice his religion without fear of penalty or reprisals." Plaintiff also seeks monetary relief in the form of compensatory and punitive damages, along with attorney's fees and costs.

## PROCEDURAL HISTORY

Plaintiff filed his Complaint (Doc. 1) in November, 2007, along with a supporting Declaration (Doc. 2). He filed two "supplements" (Doc. 5 & Doc. 6) in November, 2007 which consisted of affidavits dated in the spring of 2004 with voluminous attachments relating to incidents which occurred before the spring of 2004.[2] Plaintiff filed a Declaration in support of his Complaint with voluminous attachments on May 13, 2008. Doc. 13. Doc 13 chronicles Plaintiff's loss of his kosher diet for thirty days in September, 2006, due to his violation of the Policy 1.5.F.2 and attaches copies of his grievances/appeals of DOC staff decisions regarding the disciplinary actions which resulted in the loss of his kosher diet at that time.

---

[2] It is unknown why these affidavits were submitted. The statute of limitations for civil rights actions is three years pursuant to SDCL 15-2-15.2.

On September 24, 2008, the Court entered an Order notifying Plaintiff that if he did not effect service upon the Defendants by November 14, 2008, the case would be dismissed. *See* Doc. 18. On December 10, 2008, the case was dismissed without prejudice for failure to prosecute. *See* Doc. 20 & 21. On January 9, 2009, Plaintiff moved to reconsider the dismissal. *See* Doc. 23. Judge Piersol granted the motion and allowed the case to proceed. *See* Doc. 24. In March, 2009, Plaintiff was again provided with USM 285 forms to complete and return for service by the Marshals. Doc. 27.

The Defendants (with the exception of Muchow) were served in April, 2009. *See* Docs. 45-56. Defendants filed their Answers (Docs. 57 & 58) in early May, 2009. Plaintiff filed another Declaration with voluminous attachments on May 11, 2009 (Doc. 59). On September 1, 2009, the Court issued a Rule 16 Scheduling Order, (Doc. 69) with copies of the Local Rules of Practice and Fed. R. Civ. P. 26, 33, 34, 36, 37, and 56. The Defendants filed their Motion for Summary Judgment and supporting documents in February, 2010. Docs. 71-77. Plaintiff did not respond to the Motion.

## UNDISPUTED FACTS

The Defendants submitted a Statement of Undisputed Facts (Doc. 72) along with supporting Affidavits. Plaintiff did not file a response to the Defendants' Statement of Undisputed Facts, nor did he file a separate statement of facts as to which he contends there exists a genuine issue to be tried, as required by Local Rule 56.1(C). [3] He submitted absolutely nothing in response to Defendants' Motion for Summary Judgment. Plaintiff did submit several declarations and affidavits before the summary judgment motion. Doc. 2 was filed contemporaneously with the Complaint. The facts alleged in Doc. 2 do not differ materially than anything found in Defendants' Statement of

---

[3] The Court provided Plaintiff with a copy of the Local Rules, along with a copy of Fed. R. Civ. P. 56, when it issued the Rule 16 Scheduling Order nearly one year ago. The Court is also otherwise aware that a copy of the Local Rules are available for inmate reference in the SDSP library.

3

Undisputed Material Facts. Doc. 5 and 6 contain grievances regarding matters which occurred in 2003 and 2004 and are not pertinent to this lawsuit. Those matters are barred by the statute of limitations. Doc. 13 and Doc. 59 contain some documents which might pertain to this lawsuit, but are voluminous and commingled with grievances of other prisoners and with grievances pertaining to matters which occurred in 2004. Those matters are barred by the statute of limitations. Those grievances also pertain to matters different from those alleged in Waff's Complaint.

"A Plaintiff's verified complaint is the equivalent of an affidavit for purposes of summary judgment, and complaint signed and dated as true under penalty of perjury satisfies the requirements of a verified complaint." *Roberson v. Hayti Police Department*, 241 F.3d 992, 994-95 (8th Cir. 2001). However, if the allegations in the verified complaint consist of nothing more than conclusory allegations, they are insufficient to overcome a summary judgment motion. *Roberson v. Bradshaw*, 198 F.3d 645, 647 (8th Cir. 1999). Waff's Verified Complaint alleges the Defendants violated or deprived him of his ability to reasonably practice his sincerely held religious belief by denying him an adequate and nutritionally balanced kosher diet. But to survive summary judgment against him Waff must provide through discovery documents, affidavits, or depositions more than conclusory assertions.

Some of the Defendants' undisputed facts contradict the conclusory allegations contained in Plaintiff's verified Complaints. These contradictions do not require denial of Defendants' motion. The Local Rules of Practice for the United States District Court, District of South Dakota require the party opposing a summary judgment motion to respond to the moving party's statement of undisputed material facts, and provides "all material facts set forth in the statement required to be served by the moving party will be deemed admitted unless controverted by the statement required to be served by the opposing party." *See* Local Rule 56.1(B),(C) & (D). "Although pro se pleadings are to be construed liberally, pro se litigants are not excused from failing to comply with substantive and procedural law." *Burgs v. Sissel*, 745 F.2d 526, 528 (8th Cir. 1984). Additionally, a district court has no obligation to "plumb the record in order to find a genuine issue of material fact." *Barge v. Anheuser Busch, Inc.*, 87 F.3d 256, 260 (8th Cir. 1996). Nor is the court "required to speculate

4

on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *Id.* Because Waff did not respond to Defendants' Statement of Undisputed Facts he has admitted them.

Summary judgment could be granted without further analysis because a party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Nonetheless, the merits will be briefly examined. The undisputed facts are:

At all times relevant, Tim Reisch was the Secretary of Corrections. His duties and responsibilities are set forth in SDCL Chapter 1-15. Doc. 72, ¶ 1. At all times relevant, Douglas Weber was the Director of Prison Operations for the DOC and the Warden of the South Dakota State Penitentiary (SDSP). His office is located at the SDSP. He is responsible for overseeing and supervising operations at the SDSP and its satellite units. *Id.* at ¶ 2. At all times relevant, Misti Waagmeester was a Unit Manager for the SDSP. *Id.* at ¶ 3. At all times relevant, Jackie Schwader was a Senior Correctional Officer for SDSP. *Id.* at ¶ 5. At all times relevant, Doug Loen was Legal Counsel for the Department of Corrections. *Id.* at ¶ 6. At all times relevant, Jennifer Lane-Wagner was Cultural Activities Coordinator (CAC) at the SDSP. *Id.* at ¶ 7. At the time Plaintiff David A. Waff filed this lawsuit, he was an inmate in DOC custody and housed at the SDSP. *Id.* at ¶ 8. Waff was convicted of premeditated murder and conspiracy to commit premeditated murder and was sentenced on August 8, 1983 to concurrent life sentences. *Id.* at ¶ 9.

According to DOC records, Waff is an orthodox Jew. *Id.* at ¶ 10. Waff began receiving kosher meals at SDSP sometime in 2000. *Id.* at ¶ 11. The kosher meals that were served to inmates at SDSP between 2002 and 2007 were pre-packaged "tv dinner" style meals that met kosher standards. Those meals cost a significantly higher price than the main-line meals, and that cost was passed on directly to DOC by CBM, which had a private contract for the operation of the SDSP's kitchen and commissary. During that time period, the pre-packaged kosher meals cost $1.88 more per meal than the main-line meals. The kosher meals are provided twice each day, once at lunch and once at supper. *Id.* at ¶ 12.

On August 12, 2006, the DOC adopted policy 1.5.12.F governing religious diets at state correctional institutions. The purpose of the policy is to ensure that inmates receive a nutritionally adequate religious diet upon request, consistent with maintaining the safety, security, and order of the correctional facility. DOC Policy 1.5.F.2 applies to all religious diets and all state adult correctional institutions. *Id.* at ¶ 13. Inmates who violated the requirements of the religious diet policy adopted on August 16, 2006, were subject to progressive discipline, including temporary removal from the diet depending upon the number of rule violations. Prior to the adoption of DOC Policy 1.5.F.2, inmates who deviated from their kosher diet were issued verbal and written warnings and given minor fines. *Id.* at ¶ 14.

Pursuant to DOC policy and procedure, beginning in August 2006, inmates requesting religious dietary accommodations must complete and submit a "Request for Religious Diet" form. This requirement applied to all inmates who were already receiving a religious diet, as well as new inmates requesting a religious diet for the first time. *Id.* at ¶ 15, All inmates, regardless of religion, must complete and sign the form as directed, without qualification or proposed modifications to the terms and conditions, if they are requesting a diet that is distinct from the mainline meal plan. *Id.* at ¶ 16. The purpose for requiring inmates to complete a "Request for Religious Diet" form was to keep an accurate count of the number of inmates who were to receive a non-mainline meal, so that State resources were not wasted on meals that were not eaten and so that enough religious diet meals were prepared for each inmate requesting a diet for religious purposes. *Id.* at 17.

On August 17, 2006, a memo was sent to Waff, advising him of the new religious diet policy and the requirement that he needed to complete the "Request for Religious Diet" form. This same memo was sent to all inmates who were receiving a religious diet prior to August 2006. *Id.* at ¶ 18. On September 4, 2006, Waff submitted a modified " Request for Religious Diet" form that he prepared, and which did not comply with the language and terms of DOC Policy 1.5.F.2. *Id.* at ¶ 19. Waff's modified" Request for Religious Diet" form was rejected and, on September 18, 2006, a second memo was sent to Waff, advising him that he needed to complete the "Request for Religious Diet" form in order to continue receiving the kosher diet and advising Waff that if the form was not submitted by September 26, 2006 he would be removed from the kosher diet. *Id.* at ¶ 20. On

September 18, 2006, Waff signed a partially completed "Request for Religious Diet" form, but he failed to complete the form and he added language to that form, indicating he believed the form violated his State and Federal Constitutional rights. *Id.* at ¶ 21. On September 25, 2006, Waff received a third memo informing him again that he needed to complete the "Request for Religious Diet" form in order to participate in the religious diet. Waff was informed that an altered form could not be accepted and that he was being removed from the religious diet on September 26, 2006 for failure to comply with DOC policy 1.5.F.2. Waff was further informed he could receive a religious diet as soon as he filled out the proper form and returned it to the chapel. *Id.* at ¶ 22.

Waff has never completed the [unaltered] "Request for Religious Diet" form required by SDSP under DOC Policy 1.5.F.2 and consequently does not currently receive a kosher diet. *Id.* at ¶ 23. Waff is eligible to receive a kosher diet as soon as he completes the requisite [unaltered] "Request for Religious Diet" form. *Id.* at ¶ 24.

Waff was written up two times for violating DOC policy 1.5.F.2 following its implementation in August 2006. He challenged the disciplinary reports and sanctions at the administrative level:

- On September 14, 2006, Waff was issued a disciplinary report for taking food from another inmate's non-kosher food tray during breakfast. The disciplinary report was written at 4:15 on September 14, 2006 and delivered to Waff at 6:08 p.m. that same day. Waff submitted written statements in his defense when he was before the UDC on September 15, 2006. However, Jackie Schwader found that Waff had committed the prohibited act, and gave him a verbal warning on September 15, 2006, at 3:28 p.m.

  On September 30, 2006, Waff filed an Informal Resolution Request (IRR) complaining he had been singled out for punishment and asked that the UDC finding be reversed, that his kosher diet be reinstated and that the write-up be removed from his record. Shannon Muchow reviewed the DOC Policy 1.5.F.2 and the disciplinary report and spoke to Waff and responded that there was sufficient evidence to support the charge.

  Waff then filed a Request for Administrative Remedy (RAR) on October 9, 2006, requesting that the UDC findings be reversed. Warden Weber assigned Misti Waagmeester to investigate and recommend a response. Warden Weber signed the response denying Waff's RAR and upholding the sanction and write up.

7

On November 3, 2006, Waff filed an appeal to the Secretary of Corrections, requesting the UDC's findings be reversed and the disciplinary write up be erased from his record.

Waff's appeal to the charge to the Secretary of Corrections was denied on the grounds that a minor offense cannot be appealed to the Secretary.

- On September 14, 2006, Waff was issued a disciplinary report for failing to abide by posted rules and regulations, based upon evidence that he had purchased non-kosher food items from the commissary. This disciplinary report was written at 1:24 p.m. on September 14, 2006 and delivered to Waff at 4:18 p.m. that same day. Waff submitted a written statement in his defense when he was before the UDC on September 15, 2006. However, Jackie Schwader found that Waff had committed the prohibited act and disciplined him, pursuant to DOC policy 1.5.F.2 with 30 days loss of kosher diet and 30 days loss of commissary privileges.

On September 27, 2006, Waff filed an IRR challenging the charge. He asked that the UDC be thrown out for lack of evidence and that the write up be expunged from his record. Shannon Muchow denied Waff's IRR.

On October 2, 2006, Waff filed a RAR seeking reversal of the UDC and the expungement of his write up for violating DOC Policy 1.5.F.2. Warden Weber assigned Misti Waagmeester to investigate and recommend a response. On October 19, 2006, Warden Weber signed the response denying Waff's RAR and upholding the sanction and write up.

Waff appealed the RAR on October 31, 2006, seeking to overturn the earlier findings, expunge his record and restore his kosher diet. Waff's appeal was denied on the grounds that this issue cannot be appealed to the Secretary of Corrections.

*Id.* at ¶ 25.

Plaintiff was removed from the kosher diet plan at the SDSP on September 15, 2006, based on multiple violations of the DOC's religious diet policy. *Id.* at ¶26. The DOC's experience is that a majority of the inmates who lose their kosher diet for disciplinary reasons do not sign up for the diet after their suspension. *Id.* at ¶ 27. Records maintained by Defendant Wagner indicate that as of February 19, 2007, approximately 37 inmates had completed a suspension from the religious diet program for disciplinary reasons. Of those 37 inmates, only 15 elected to resume their religious diets, while 22 did not. *Id.* According to Wagner, since she began keeping records in 2006 of inmates receiving the kosher diet, there have been 442 instances of inmates having discontinued the kosher diet. That statistic includes some inmates who have repeatedly gone back and forth between the kosher diet and the main line meal. Currently thirteen inmates receive the kosher diet. *Id.* at ¶ 28.

When an inmate is removed from a religious diet for disciplinary reasons, the DOC does not assume the inmate will want to resume the diet after the suspension has been completed. Rather, an inmate must complete and submit a form indicating he wishes to resume the religious diet. *Id.* at ¶ 29. Effective February 14, 2007, the DOC modified Policy 1.5.F.2 to change the available disciplinary sanctions. Under the revised policy, an inmate who violates any of the rules, policies or procedures governing religious diets is still subject to disciplinary sanctions, but can no longer be removed from his or her religious diet. *Id.* at ¶ 30.[4]

## ANALYSIS

### 1. Summary Judgment Standards

"Summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, demonstrates that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law." *Clark v. Kellog Co.*, 205 F.3d 1079, 1082 (8th Cir. 2000); Fed. R. Civ. P. 56(c). To avoid summary judgment, the non-moving party must "show that admissible evidence will be available at trial to establish a genuine issue of material fact." *Churchill Business Credit, Inc. v. Pacific Mutual Door Co.*, 49 F.3d 1334, 1337 (8th Cir. 1995). "Once the motion for summary judgment is made and supported, it places an affirmative burden on the non-moving party to go beyond the pleadings and by affidavit or otherwise designate specific facts showing that there is a genuine issue for trial." *Commercial Union Ins. v. Schmidt*, 967 F.2d 270, 271 (8th Cir. 1992) (internal quotation marks and citations omitted). "Summary judgment is an extreme remedy, to be granted only when no genuine issue exists as to any material fact." *Moore v. Jackson*, 123 F.3d 1082, 1086 (8th Cir. 1997).

While prisoners are entitled to the benefit of liberal construction of their pleadings because of their pro se status, Fed. R. Civ. P. 56 remains applicable to them. *Quam v. Minnehaha County Jail*, 821 F.2d 522 (8th Cir. 1987). Courts must remain sensitive, however, to the special problems faced by prisoners attempting to proceed pro se in vindicating their constitutional rights, and the Eighth Circuit has explicitly disapproved of summary dismissal of prisoner pro se claims without

---

[4]The Affidavit of Jennifer Wagner (Doc. 73) contains copies of both the old (EX A) and the revised (EX H) versions of the religious diet policy.

regard for these special problems. *Nickens v. White*, 622 F.2d 967, 971 (8th Cir. 1980). "When dealing with summary judgment procedures the technical rigor is inappropriate where . . . uninformed prisoners are involved." *Ross v. Franzen*, 777 F.2d 1216, 1219 (7th Cir. 1985). It is with these standards in mind that Plaintiff's case is considered.

### 2. RLUIPA and First Amendment

Broadly construed, Plaintiff's Complaint alleges the Defendants violated his right to exercise his religion when they (1) sanctioned him for violating Policy 1.5.F.2 by removing him from the kosher diet list and (2) required him to complete the "Religious Diet Request" form before allowing him to return to the kosher diet plan.[5]

Plaintiff alleges the Defendants have violated his rights under the First Amendment and 42 U.S.C. §§ 2000cc et. al., the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA). The application of those principles to an inmate's right to practice his religion in the prison setting is briefly discussed.

Several principles guide the consideration of a prisoner's First Amendment right to practice his religion. *O'Lone v. Shabazz*, 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987).

> First, convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison. Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion. Second, lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system. The limitations on the exercise of constitutional rights arise both from the fact of incarceration and from valid penological objectives–including deterrence of crime, rehabilitation of prisoners, and institutional security.
>
> In considering the appropriate balance of these factors, we have often said that evaluation of penological objectives is committed to the considered judgment of prison administrators, who are actually charged with and trained in the running of the

---

[5]To date, Plaintiff continues to refuse to complete the form, so he remains off the kosher diet nearly four years after his original rule infraction.

> particular institution under examination. . . . When a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.

*Id.,* 482 U.S. at 348-49, 107 S.Ct. at 2404 (internal punctuation and citations omitted). Several factors are weighed to determine the reasonableness of the regulation at issue: (1) whether there is valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the rights that remain open to prison inmates; (3) the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; (4) the absence of ready alternatives is evidence of the reasonableness of a prison regulation. *Turner v. Safley,* 482 U.S. 78, 89-90, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 282 (1987). This last factor is not a "least restrictive alternative" test, "but if an inmate can point to an alternative that fully accommodates his right at de minimis cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Id.* The above-stated evaluation comes into play only when the inmate first establishes the existence of a sincerely held religious belief. *Iron Eyes v. Henry,* 907 F.2d 810, 813 (8th Cir. 1990).

Also,

> The responsible prison officials . . . need only show that the religious practice could create a potential threat to a legitimate penological objective. If this showing is made, the trial court must defer to prison officials' expertise in matters of prison administration unless there is substantial evidence that the officials' belief that the regulation is necessary is unreasonable or that their response is exaggerated. If the prisoner has not shown that the officials' belief is unreasonable or their response is exaggerated, the prisoner's right must yield to the prison regulation.

*Butler-Bey v. Frey,* 811 F.2d 449, 451 (8th Cir. 1987).


Congress enacted the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc et. seq. in 2000. It establishes a statutory free exercise claim which embraces a higher standard of review than constitutional free exercise claims. *Murphy v. Missouri Dept. of Corrections,* 372 F.3d 979, 987 (8th Cir. 2004). The statute provides:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 2 of the Civil Rights of Institutionalized Persons Act (42 U.S.C. § 1997), even if the burden results

> from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person-
> (1) is in furtherance of a compelling governmental interest; and
> (2) is the least restrictive means of furthering that governmental interest.

42 U.S.C. § 200cc-1(a). A prisoner claiming a RLUIPA violation must show, as a threshold matter, that there is a substantial burden on his ability to exercise his religion. *Murphy*, 372 F.3d at 988, 42 U.S.C. § 2000cc-2(b).

RLUIPA does not contain a definition of substantial burden. The standard cited in *Murphy* was that the

> government policy or actions must significantly inhibit or constrain conduct or expression that manifests some central tenet of a person's individual religious beliefs; must meaningfully curtail a person's ability to express adherence to his or her faith; or must deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion.

*Murphy*, 372 F.3d at 988. The Eighth Circuit has since acknowledged, however, that the "central tenet" and "fundamental" portions of this definition are probably unworkable as they pertain to a RLUIPA claim because 42 U.S.C. § 2000cc-5(7) defines religious exercise as "any exercise of religion, whether on not compelled by, or central to, a system of religious belief." *See, Patel v. United States Bureau of Prisons* 515 F.3d 807, 813 & n.7 (8th Cir. 2008). In *Van Wyhe v. Reisch* 581 F.3d 639 (8th Cir. 2009) the Eighth Circuit noted it was "mindful that RLUIPA's broad protection of 'religious exercise' extends even to religious practices that are not 'compelled by, or central to' a certain belief system." *Id.* at 656.

Courts have struggled to define a substantial burden under RLUIPA. In *Washington v. Klem*, 497 F.3d 272 (3rd Cir. 2007), the Third Circuit examined Supreme Court precedent interpreting the First Amendment Free Exercise Clause and RLUIPA's legislative history to refine a workable definition for the prison setting: "for the purposes of RLUIPA, a substantial burden exists where: 1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit; OR 2) the government puts substantial pressure on an adherent to

12

substantially modify his behavior and to violate his beliefs." *Id.*, 497 F.3d at 280.[6] Other courts have formulated similar definitions: "We have previously defined a 'substantial burden' as being 'significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly . . . in order to constitute a 'substantial burden' on religious practice the government's action must be more than 'incidental' and 'must place more than an inconvenience on religious exercise . . . to constitute a substantial burden under RLUIPA, the governmental action must significantly hamper one's religious practice." *Smith v. Allen*, 502 F.3d 1255, 1276-77 (11th Cir. 2007). "The type of burden that puts substantial pressure on [the plaintiff] to modify his behavior and violate his beliefs." *Ketchmar v. Beard*, 241 Fed. Appx. 863, 865 (3rd Cir. 2007); "The interference must be more than an inconvenience; the burden must be substantial and significantly interfere with Plaintiff's practice of his religious beliefs . . . a substantial burden pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs." *Jackson v. Ellis*, 2008 WL 89861 (N.D. Fla. Jan. 7, 2008) *4.

3.  **Plaintiff's Claims Regarding the Constitutionality of Policy 1.5.F.2 and for Prospective/Injunctive Relief are Moot Because the Policy Has Been Revised and No Longer Provides for Removal From the Religious Diet Program as Sanction for Violation of the Policy**

At the very heart of Plaintiff's Complaint is his claim that his removal from the religious (kosher) diet program as punishment for a violation of Policy 1.5.F.2. was unconstitutional, and his request for injunctive relief in the form of an order for the Court to direct Defendants to immediately provide him with a "nutritionally balanced and adequate diet that is in keeping with Plaintiff's religious requirements." Plaintiff was sanctioned in September, 2006 for repeatedly violating Policy 1.5.F.2. His sanction consisted of removal from the kosher diet plan for a period of thirty days. As of February 14, 2007, however, the policy was revised. While disciplinary sanctions remain available for the violation of the religious diet policy, removal from the religious diet program is not one of them.

---

[6]*Washington* acknowledged –but rejected–the "substantial burden" formula articulated by the Eighth Circuit in *Murphy*. *Washington*, 497 F.3d at 280, fn. 6. *Washington* rejected the "substantial burden" formula articulated in *Murphy* because the inquiry included whether the governmental policy affected a "central tenet" of the individual's beliefs, "even though RLUIPA explicitly protects religious exercise including activities which are not necessarily central to a system of religious belief." *Id.*

A prisoner's claim for injunctive relief is moot if he is no longer subject to the conditions which prompted his complaint. *Martin v. Sargent*, 780 F.2d 1334, 1337 (8th Cir. 1985). Likewise, a claim for declaratory relief is moot when the challenged condition ceases to exist. *Smith v. Hundley*, 190 F.3d 852, 855 (8th Cir. 1999). Waff's claims about the constitutionality of removing inmates from their religious diets as a sanction for violating Policy 1.5.F.2 and his requests for injunctive or declaratory relief are moot. *See also, Van Wyhe v. Reisch*, 536 F.Supp.2d 1110, 1120-21 (D.S.D. 2008) *affd. in part and reversed in part*, 581 F.3d 639 (8th Cir. 2009).[7]

### 4. Plaintiff Has Failed to Articulate How the Request for Religious Diet Form Violates His Rights

Although Waff's original sanction in September, 2006 was for only thirty days, he remains without his kosher diet because he continues to refuse to complete and sign an unaltered "Request for Religious Diet" form. Waff has been informed by prison staff that he can receive a kosher diet as soon as he properly completes the form. Wagner Aff. (Doc. 73) ¶ 8. Wagner also explained that prison officials do not assume an inmate will want to resume a religious diet after he has been removed from the religious diet program. Inmates are required to complete the request form in order to resume the religious diet. *Id.* at ¶ 10. Out of 37 inmates who lost their religious diet privileges, 22 did not resume the program. *Id.* at ¶ 11.

Waff has indicated he believes the requirement to complete the "Request for Religious Diet" form violates his constitutional rights. *See, e.g.* Doc. 2, Doc. 13 attachments. But Waff has not explained why he believes the requirement to complete the form violates his First Amendment right to exercise his religion nor has he explained why he believes the form violates RLUIPA (i.e. how completion of the form imposes a substantial burden on the exercise of his religion). The form merely requests him to indicate whether he requests a (1) Muslim/non-pork diet; (2) kosher diet; or (3) "other" religious diet. If an inmate indicates "other" he is required to describe the diet and

---

[7]The *Van Wyhe* case originated out of the South Dakota SDSP and the implementation of Policy 1.5.F.2. The issues in that case are practically identical to Waff's case. Plaintiff has filed nothing in this case since the Eighth Circuit decision in *Van Wyhe*.

indicate the prohibited/mandated foods, and how the diet relates to his religion.[8] There is no infringement upon Waff's constitutional right to exercise his religion under the First Amendment if he is required to complete the form to re-enroll in the kosher diet plan at SDSP. *See Resnick v. Adams*, 348 F.3d 763, 768-770 (9th Cir. 2003) (requirement for federal prisoner to sign application to receive kosher meals violated neither predecessor to RLUIPA or the First Amendment). Likewise it is not a substantial burden on his right to exercise his religion under RLUIPA to require him to complete the form to re-enroll in the kosher diet plan at SDSP. Summary Judgment should be GRANTED as to Waff's First Amendment and RLUIPA complaints about the "Religious Diet Request" form.

### 5. Plaintiff's Claims for Monetary Damages Under RLUIPA and § 1983

Waff's claims for injunctive relief are moot. He cannot make a claim for monetary damages for the DOC's *ongoing* failure to provide him with kosher meals because he can receive a religious diet as soon as he completes the "Request for Religious Diet" form. It is not a violation of the First Amendment or RLUIPA to require him to complete the form.

Waff's only remaining claim is for monetary damages for his thirty day loss of the kosher diet when sanctions were imposed as a result of his violation of the religious diet policy in September, 2006. *Van Wyhe I* and *Van Wyhe II* govern Waff's claim for monetary damages.[9]

#### a. RLUIPA Claims.

RLUIPA does not authorize individual capacity claims against prison officials. *Van Wyhe I*, 536 F.Supp.2d at 1118. While RLUIPA allows official capacity claims against prison officials, it does not authorize monetary damages based on official capacity claims. *Van Wyhe II*, 581 F.3d at 655. Summary judgment should be GRANTED therefore, on Waff's RLUIPA claim.

---

[8]Because Plaintiff indicates he desires a kosher diet, he would only be required to mark the "kosher" box on the form, sign it, date it, and return it to the cultural activities coordinator. He would not be required to describe the diet, identify the foods which are mandated/prohibited, or explain how the diet relates to his religion.

[9]*Van Wyhe v. Reisch* 536 F.Supp.2d (D.S.D. 2009) (*Van Wyhe I*) and *Van Wyhe v. Reisch* 581 F.3d (8th Cir. 2009) (*Van Wyhe II*)

15

### b. Section 1983 Claims.

Claims for monetary damages against Defendants in their official capacities are claims against the State of South Dakota, and damage claims against the State are barred by the Eleventh Amendment unless South Dakota has consented to suit or Congress has abrogated its immunity. *Van Wyhe I*, 536 F.Supp.2d at 1117-18. South Dakota has not consented to suit under 42 U.S.C. § 1983 and Congress has not abrogated South Dakota's Eleventh Amendment immunity under § 1983. All claims for monetary relief against the Defendants in their official capacities under § 1983 are barred. *Id.* But Waff's claims for monetary damages against the prison officials in their individual capacities are not barred by the Eleventh Amendment, subject to certain defenses including qualified immunity. *Van Wyhe I*, 536 F.Supp.2d at 1118.

Van Wyhe's First Amendment claim regarding the loss of kosher diet privileges for violation of Policy 1.5.F.2 survived summary judgment against prison officials in *Van Wyhe I*. Like Van Wyhe, Waff's sincerity about his beliefs has not been questioned. Judge Piersol found the policy as applied before February 14, 2007, infringed upon the inmate's religious beliefs. *Van Wyhe I*, 536 F.Supp.2d at 1120. The remainder of the *Turner* factors led to the conclusion that there was insufficient evidence to establish Policy 1.5.F.2 was reasonably related to a legitimate penological interest. *Id.* at 1121-22. But that does not end the inquiry.

> Qualified immunity protects a governmental official from suit when his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. What this means in practice is that whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action assessed in light of the legal rules that were clearly established at the time it was taken.

*Van Wyhe I*, 536 F.Supp.2d at 1122 (citation omitted, punctuation altered). Because qualified immunity is "an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial. Indeed, we have made clear that the 'driving force' behind creation of the qualified immunity doctrine was to ensure that 'insubstantial claims against government officials will be resolved prior to discovery.' Accordingly 'we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Pearson*

*v. Callahan*, 129 S.Ct. 808, 815, 172 L.Ed.2d 565, (2009) (internal citations omitted, punctuation altered).

> In [*Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151], this Court mandated a two-step sequence for resolving government officials' qualified immunity claims. First, a court must decide whether the facts that a plaintiff has alleged (see Fed. Rules Civ. Proc. 12(b)(6), (c)) or shown (see Rules 50, 56) make out a violation of a constitutional right. 533 U.S. at 201, 121 S.Ct. 2151. Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct. *Ibid.* Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right. *Id.* 129 S.Ct. at 815-16 (citations omitted)......On reconsidering the procedure required in *Saucier*, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory. The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.

*Id.*, 129 S.Ct. at 815-16, 818.

In *Van Wyhe*, the plaintiff was deprived of his kosher diet for violating the religious diet policy during the approximate same time-frame as Mr. Waff (late 2006 to early 2007). Although the *Van Wyhe* defendants did not present enough evidence to justify summary judgment on the First Amendment issue, they were entitled to summary judgment based on qualified immunity because "when Policy 1.5.F.2 was enforced against Plaintiff it was not clearly established that denying a prisoner kosher meals for eating non-kosher foods would violate his constitutional rights. . . . Accordingly, . . . Defendants are entitled to qualified immunity on Plaintiff's claim that Policy 1.5.F.2, as it existed before February 14, 2007, violated his constitutional right to exercise his religion." *Van Wyhe I*, 536 F.Supp.2d at 1124. According to *Callahan*, it is not necessary to analyze whether defendants are entitled to summary judgment on the merits of Plaintiff's First Amendment claim because they are entitled to qualified immunity under *Van Wyhe I*. On this lone remaining claim Defendants are entitled to qualified immunity. Their motion for summary judgment should be GRANTED.

## CONCLUSION

It is respectfully recommended to the District Court that Defendants' Motion for Summary Judgment (Doc. 71) be GRANTED and that Plaintiff's Complaint be DISMISSED, with prejudice and on the merits.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court.

*Thompson v. Nix,* 897 F.2d 356 (8th Cir. 1990)
*Nash v. Black,* 781 F.2d 665 (8th Cir. 1986)

Dated this 30 day of July, 2010

BY THE COURT:

John E. Simko
United States Magistrate Judge